MIDDLESEX RETIREMENT
SYSTEM

v.

QUEST SOFTWARE INC., Vincent C.
Smith, M. Brinkley Morse, Michael J.
Lambert, Douglas Garn, David M.
Doyle, Jerry Murdock, Jr., and Kevin
Brooks.

No. CV 06–6863 DOC (RNBx).

United States District Court,
C.D. California.

Oct. 22, 2007.

Anthony D. Green, Chet B. Waldman, Marian P. Rosner, Patricia I. Avery, Wolf Popper, New York, NY, Blake M. Harper, Sarah Weber, Hulett Harper Stewart, San Diego, CA, for Middlesex Retirement System.

Aaron F. Olsen, Koji F. Fukumura, Cooley Godward Kornish, San Diego, CA, for Quest Software Inc., Vincent C. Smith, M. Brinkley Morse, Michael J. Lambert, Douglas Garn, David M. Doyle, Jerry Murdock, Jr., and Kevin Brooks.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT.

DAVID O. CARTER, District Judge.

Before the Court is Defendants Quest Software Inc., Vincent C. Smith, M. Brinkley Morse, Michael J. Lambert, Douglas F. Garn, David M Doyle, Jerry Murdock, Jr., and Kevin Brooks' Motion to Dismiss First Amended Complaint ("Defendants' Motion") Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u, *et seq.* The Court finds the matter appropriate for decision without oral argument Fed. R.Civ.P. 78; Local R. 7–15. Accordingly, the hearing set for September 10, 2007 was removed from the Court's calendar. After considering the moving, opposing, and replying papers, the Court hereby GRANTS IN PART AND DENIES IN PART Defendants' Motion and DISMISSES the specified portions of Plaintiff's First Amended Complaint ("FAC") WITHOUT PREJUDICE.

## I. BACKGROUND

### A. The Parties

Plaintiff Middlesex Retirement System ("Plaintiff") is a Massachusetts pension fund, established on December 2, 1911. Plaintiff is seeking class certification for all those persons or entities who purchased Quest securities ("the securities") during the period of November 9, 2001 through July 3, 2006 ("the Class Period"). Defendant Quest Software, Inc., ("Quest" or "the Company") is a California corporation that designs, develops, distributes, and supports software products that work with other software applications and database management systems. Quest's common stock was registered with the Securities

and Exchange Commission ("SEC") pursuant to the Exchange Act and traded on the NASDAQ National Market.

Defendant Vincent C. Smith ("Smith") has served as Chairman of the Board of Directors of Quest ("the Board") since 1998, Chief Executive Officer ("CEO") since April 1997, and as a director since 1995. Smith signed each Form 10–K and 10–K405 during the Class Period. Pl's First Am. Compl. ¶ 21. For the Form 10–Ks and 10–Qs issued from August 14, 2002 through the end of the Class Period, Smith signed the Certification of the CEO pursuant to Exchange Act Rule 13A–14 and 15D–14, as adopted pursuant to § 302 of the Sarbanes–Oxley Act of 2002 ("SOX"), and the Certification pursuant to 18 U.S.C. § 1350, as adopted pursuant to SOX § 906 (" § 1350 Certification"). Id. ¶ 22 During the Class Period, Smith was granted at least 1,585,000 stock options, and sold at least 445,300 shares of Quest stock for proceeds of approximately $6,875,382.82. Id. ¶¶ 23–24.

Defendant M. Brinkley Morse ("Morse") served as Quest's Senior Vice President, Corporate Development from April 2005 until his resignation on or about November 24, 2006. Morse previously served as Vice President, Finance and Operations of the Company from January 2001 through May 2003, and as Chief Financial Officer from May 2003 through April 2005. Morse signed each Form 10–K and 10–K405 filed in years 2002 through 2005. Additionally, Morse signed the Certification of the CFO pursuant to Exchange Act Rule 13A–14 and 15D–14 and the § 1350 Certification. Id. ¶ 28. During the Class Period, Morse was granted at least 850,000 stock options. Id. ¶ 30. Morse allegedly declined to be interviewed by the Special Committee for the Company's investigation into the stock option matters underlying the allegations

in Plaintiff's FAC; Morse resigned instead. Id. ¶ 27.

Defendant Michael J. Lambert ("Lambert") served as Quest's Senior Vice President of Finance from November 2004 until April 2005, when he became the Company's Chief Financial Officer. Lambert is Quest's current CFO. Lambert signed the Form 10–K filed in 2006. For the Form 10–Ks and 10–Qs from May 10, 2005 through the end of the Class Period, Lambert signed the Certification of the CFO pursuant to Exchange Act Rule 13A–14 and 15D–14 and the § 1350 Certification. Id. ¶ 35.

Defendant Douglas F. Garn ("Garn") has served as Quest's President since February 2005. Garn previously served as Quest's Vice President, Worldwide Sales from January 1998 to January 2002, and returned to this position in January 2003 through February 2005. During the Class Period, Garn was granted at least 480,000 stock options and sold at least 65,000 shares of Quest stock for proceeds of approximately $983,700. Id. ¶¶ 39–40.

Defendant David M. Doyle ("Doyle") served as a Director of Quest from 1987 until June 2004. Doyle served as Quest's President until March 2003.[1] Doyle was a member of the Audit Committee of the Board of Directors ("the Audit Committee") from 1999 to 2001. Doyle signed each Form 10–K and 10–K405 filed in years 2002 through 2004. During the Class Period, Doyle was granted at least 100,000 stock options, and sold at least 1,974,543 shares of Quest stock for proceeds of approximately $26,679,352.74. Id. ¶¶ 45–46.

Defendant Jerry Murdock, Jr. ("Murdock") has been a Director of Quest since April 1999. Murdock was a member of the Compensation Committee of the Board of

---

**1.** Plaintiff's FAC does not specify when Doyle started as Quest's President.

Directors ("the Compensation Committee") from 1999 through February 2005. The Compensation Committee allegedly reviews and approves the compensation and benefits for the Company's executive officers and administers the Company's 1999 Stock Incentive Plan, under which the options at issue in this case were granted. *Id.* ¶ 49. Murdock is currently a member of the Audit Committee, of which he was formerly the Chairman from 1999 through July 2005. In addition to signing each Form 10–K and 10–K405 filed by Quest during the Class Period, Murdock also signed the Audit Committee reports contained in the proxy statements filed by the Company with the SEC in years 2002 through 2005. During the Class Period, Murdock sold at least 202,274 shares of Quest stock for proceeds of approximately $2,189,454.29. *Id.* 153.

Defendant Kevin Brooks ("Brooks") was Quest's Vice President and Corporate Controller (the Company's principal accounting officer) from September 2000 until October 20, 2006. On October 20, 2006 Brooks was reassigned in connection with Quest's Special Committee investigation of the stock option matters underlying the allegations in Plaintiff's FAC. *Id.* ¶ 56. Brooks signed each Form 10–Q, 10–K, and 10–K405 filed during the Class Period. During the Class Period, Brooks was granted at least 40,000 stock options, and sold at least 57,620 shares of Quest stock for proceeds of approximately $891,691.87. *Id.* ¶ 59.

Defendants Smith, Morse, Lambert, Garn, Doyle, Murdock, and Brooks are collectively referred to as "Individual Defendants." Plaintiff alleges that, by virtue of their positions at Quest, the Individual Defendants had access to the adverse and undisclosed information about the operating results and financial condition of the Company. *Id.* ¶ 63.

## B. Stock Options and Backdating

Given the media attention and the numerous national scandals, there is widespread public awareness of various companies' backdating of stock options. Nevertheless, in the interest of thoroughness and a proper understanding of the scheme Plaintiff has alleged, the Court will briefly restate the nature of stock options and "backdating." A stock option gives an employee a right to buy company stock in the future at the price of the stock on the date of the grant. This price is referred to as the "exercise price" or the "strike price," and the date is referred to as the "measurement date." If the stock price rises, the options have value. The plan under which an option is granted will often have a time frame during which the option cannot be exercised; i.e., the person who holds the option cannot take advantage of the option for an amount of time defined by the option plan. Once this time has elapsed, the option is "vested" and can be exercised at will by the grantee. As described by U.S. District Judge William Alsup:

"Once exercisable, the options are worth the difference between the exercise price and the current market price. If the stock price falls, the options are worthless. Options with an exercise price equal to the stock's price as of the grant date are referred to as 'at-the-money' options. Those with an exercise price lower than the stock's market price are referred to as 'in-the-money' options.... For financial reporting purposes, companies granting in-the-money options have to recognize compensation expenses equal to the difference between the market price and the exercise price. No compensation costs need be recognized for at-the-money options, for the company does not forego any revenue by granting them. The motive for

backdating is to avoid a 'hit to the earnings,' i.e., a compensation expense, while still awarding in-the-money options. Those responsible simply backdate the grants to a date where the stock price was attractively low and pretend that the grant was awarded on the earlier date rather than the real date. [This creates a 'paper profit.'] Since the paperwork shows that the exercise price is the same as the market price on the phony grant date, they pretend no need exists to recognize an expense ... The company is in effect granting in-the-money options without recognizing the attendant compensation expense."

*In re Zoran Corp. Deriv. Litig.*, 511 F.Supp.2d 986, 996–67 (N.D.Cal.2007).

Through this process, the companies accrue a double benefit. First, companies are able to avoid reporting a higher compensation expense and paying the taxes associated therewith, thereby artificially inflating net income and the price of their stock. Second, those being granted options (often directors and management) can secretly inflate their own compensation using improper methods that are not disclosed to the company's shareholders or the public at large. *See* Pl.'s First Am. Compl. at ¶ 83.

Since this backdating process has entered the public consciousness, more than "190 companies have either announced internal reviews of their own option practices for apparent backdating or been placed under state or federal investigation for the practice." *Id.* ¶ 80. Once the Sarbanes–Oxley Act of 2002 ("SOX") and the resulting SEC rules became effective in August of 2002, stock option grants were required to be reported within two business days. *Id.* ¶ 82. Previously, stock option grants were not required to be reported until after the end of the fiscal year. Thus prior to August 2002, a granting body could potentially grant the option, but then at the end of the fiscal year, before reporting the option and its corresponding grant date, look back on the stock's performance for the past year and change the measurement date of the stock to reflect the best price for the year. By only permitting a two day window between the granting of an option and the reporting of the option, SOX attempted to curtail the ability of companies to engage in this backdating process. No longer could option-granting bodies look back over the past year and select the best date, post-SOX this "look back" period was restricted to two business days.

### C. Alleged Backdating at Quest

Plaintiff has provided a highly detailed time line documenting the alleged backdating that occurred at Quest. The Court does not make any determination regarding the ultimate validity or truth of Plaintiff's statements, but must nevertheless consider them true for purposes of this motion. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, ⎯ U.S. ⎯, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007); *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir.2006).

On June 9, 1999, the stockholders of Quest adopted the 1999 Stock Incentive Plan (the "1999 Plan") for Company employees. Plaintiff alleges that pursuant to the 1999 Plan, all of the options granted to Quest employees or non-employee Board members of the kind that are the subject of Plaintiff's FAC (the "incentive options") would have an exercise price per share not less than one-hundred percent (100%) of the fair market value per share of Quest common stock on the option grant date. Pl.'s First Am. Compl. ¶ 88. Plaintiff further alleges that under "the [1999] Plan, (i) there would be no compensation expense to the Company, and (ii) there would be an incentive for the employee to do his or her part to increase the value of Quest stock

from the grant date so that the option would have value." *Id.* ¶ 89. The Board's Compensation Committee administered the Plan pursuant to which the stock options at issue in Plaintiff's FAC were granted.

Plaintiff has made several allegations regarding option grants to the Individual Defendants. Quest issued approximately four million options in 2000. One of the recipients of these options was Defendant and then Vice President Garn, who received 80,000 option grants that reportedly had an exercise price based on the April 14, 2000 closing market price for Quest stock. According to Plaintiff, these grants were reported to have occurred on the very day that Quest's stock traded at its lowest price per share for that year. *Id.* ¶ 6(a). Quest also issued over 8.9 million options during 2001, with exercise prices based on the March 28, 2001, April 4, 2001, and October 1, 2001 closing market prices for Quest stock.

Defendant and then-CFO Morse received 250,000 option grants based on the March 28, 2001 closing market price for Quest stock. One month later, Quest's stock price was trading 143.09% higher than the purported option grant date. Also in 2001, Defendant and CEO Smith received 300,000 option grants, Defendant Doyle received 100,000 option grants, Defendant Garn received 300,000 additional option grants, and Defendant Morse received an additional 100,000 option grants. Eyal M. Aronoff ("Aronoff"), a non-party to this suit, President of a company acquired by Quest, and Chief Technical Officer of Quest from September 2000 to June 3, 2003, received 200,000 option grants. All of these grants had exercise prices based on the April 4, 2001 closing market price for Quest stock. One month later, Quest's stock price had risen 123.16% from the April 2001 closing market price.

Later that same year, Defendant Smith received 485,000 option grants, Defendant Garn received 100,000 option grants, Defendant Morse received 300,000 option grants, Defendant Brooks received at least 20,000 option grants, and Aronoff received 550,000 option grants, all of which had reported exercise prices based on the October 1, 2001 closing market price for Quest stock. According to Plaintiff, these grants were reported to have occurred within two days of the lowest price per share for Quest's stock of that year. *Id.* ¶ 6(b)(iii). In 2002, Defendant Smith received 800,000 option grants, Defendant Morse received 200,000 option grants, and Aronoff received 600,000 option grants, all of which had reported exercise prices based on the August 7, 2002 closing market price for Quest stock. These grants occurred within two days of, and three cents above, the lowest price per share for Quest stock for the first eight months of that year. *Id.* ¶ 97.

In total, Defendant Smith received 1,585,000 option grants, Defendant Morse received 850,000 option grants, Defendant Doyle received 100,000 option grants, Defendant Garn received at least 480,000 option grants, Defendant Brooks received 40,000 option grants, and Aronoff received 1,350,000 option grants. Plaintiff alleges that all of these options were granted for prices below the fair market value of the Company's stock; yet the Company failed to establish a compensation expense. Plaintiff alleges that because of the difference between the exercise price and the market price on the actual dates the option grants should have been reported as compensation, the Company had lower earnings than those that were reported, and therefore Defendants' option granting practices have caused false and misleading financial reporting under GAAP.

Under the Charter of Quest's Compensation Committee of the Board of Directors, the Compensation Committee has the responsibility of supervising the administration of the Company's 1999 Stock Incentive Plan. Defendant Murdock served on the Compensation Committee during the Class period and, Plaintiff alleges, approved or accepted the stock option grants. Under the Charter of Quest's Audit Committee of the Board of Directors, the Audit Committee had the responsibility of reviewing and consulting with management and the independent auditor regarding the quality, adequacy, and effectiveness of Quest's internal financial reporting controls. Additionally, Plaintiff alleges it was the Audit Committee's responsibility to review the financial statements issued during the relevant time period. Defendants Doyle and Murdock served on the Audit Committee and either approved or accepted the financial statements.

### D. False and Misleading Statements Made During the Class Period

Plaintiff has alleged that Defendants either made, or caused to be made numerous false and misleading statements during the Class Period. *Id.* ¶ 109. The crux of Plaintiff's assertion is that by pricing the options below the stock's fair market value on the actual grant date, Defendants were able to bring an instant paper profit to themselves and others (i.e., Aronoff). In turn, by failing to properly record the costs associated with the options in its financial statements, Quest's costs were understated, and its profits were overstated during the fiscal periods in which the options were granted. This further increased the profit to Defendants by artificially elevating the market price of Quest's stock. As Quest is a public company traded on the NASDAQ exchange, these overstatements were represented to shareholders and the public-at-large by

way of various SEC-required forms, including Form 10–Qs and 10–Ks, among others.

### I. Form 10–Qs, 10–Ks, and 10–K405s

Plaintiff alleges that each Form 10–Q, from the third quarter of fiscal 2001 through the end of fiscal 2004, was false and misleading as a result of Defendants Smith, Morse, and Brooks allowing Company employees to manipulate the measurement dates of employee stock options to achieve the aforementioned effect of creating a "paper profit." *Id.* ¶ 113. Further, Plaintiff alleges that the collective actions of Defendants Quest, Smith, Morse, and Brooks caused the Company's financial statements to under-report charges to its stock-based compensation expense, which in turn inflated the Company's net income during the Class Period. *Id.* ¶ 114. Specifically, Defendants Morse and Brooks both signed each Form 10–Q for the third quarter of fiscal 2001 through the end of fiscal 2004. Additionally, Defendants Smith and Morse both signed certifications for each Form 10–Q for the second quarter of fiscal 2002 through the end of fiscal 2004 pursuant to Exchange Act Rule 13A–14 and 15D–14, as adopted pursuant to § 302 of SOX, and 18 U.S.C. § 1350, as adopted pursuant to § 906 of SOX (hereinafter, the "SOX Certifications"). These signatures certified that the reports did not contain any untrue statements of material fact; and that the financial statements fairly presented in all material respects the financial condition, results of operations and cash flows of the Company. *See* 18 U.S.C. § 1350(b).

Plaintiff alleges that each Form 10–Q for the first quarter of fiscal 2005 through the first quarter of fiscal 2006 was false and misleading as a result of Defendants Smith, Brooks, and Lambert allowing Company employees to manipulate the

measurement dates of employee stock options to achieve the aforementioned effect of creating a "paper profit." Id ¶ 117. Defendants Lambert and Brooks both signed each Form 10–Q filed for the first quarter of fiscal 2005 through the first quarter of fiscal 2006. Defendants Smith and Lambert also each signed SOX Certifications for each Form 10–Q for the first quarter of fiscal 2005 through the first quarter of fiscal 2006.

Plaintiff also alleges that each Form 10–K or Form 10–K405 filed in years 2002 through 2005 was false and misleading. Specifically, the Form 10–K405 filed in 2002 and the Form 10–Ks filed in 2003 and 2004 were signed by Defendants Smith, Doyle, Morse, Brooks, and Murdock. The Form 10–K filed in 2005 was signed by Defendants Smith, Morse, Brooks, and Murdock. Additionally, Defendants Smith and Morse both signed SOX Certifications for each Form 10–K filed in years 2003 through 2005. Plaintiff also alleges that the Form 10–K filed with the SEC in 2006 was false and misleading. The Form 10–K filed in 2006 was signed by Defendants Smith, Lambert, Brooks, and Murdock. Defendants Smith and Lambert also signed the 2006 SOX Certifications.

### ii. Proxy Statements & Form 4s

Beyond the Form 10–Ks, 10–K405s, and 10–Qs, Plaintiff is alleging that various proxy statements also contained false or misleading statements. The proxy statement filed with the SEC on April 30, 2002 (the "2002 Proxy Statement") represented that the value of the Company's stock options was "calculated on the basis of the fair market value of [Quest's] Common Stock on the exercise date." Id. ¶ 130. The 2002 Proxy Statement also disclosed the option grants to Defendants Smith, Garn, Doyle, Morse, and non-party Aronoff in 2001. The proxy statement filed with the SEC on April 30, 2003 (the "2003 Proxy Statement") stated that "the stock

options granted in the last fiscal year were 'granted at an exercise price equal to the fair market value of Quest Common Stock on the grant date.' " Id. ¶ 131. Plaintiff alleges that Defendants Smith, Morse, Doyle, Brooks, and Murdock caused the Company to file both the 2002 Proxy Statement and 2003 Proxy Statement.

In the 2002 Proxy Statement, the Compensation Committee stated that "[n]one of [their] executive officers received non-performance-based compensation in an amount exceeding the limit" in Section 162(m) of the Internal Revenue Code, which prohibits a federal income tax deduction to publicly held companies for compensation paid to certain executive officers, to the extent that compensation exceeds $1.0 million per covered officer in any fiscal year. Additionally, the Compensation Committee stated that it "does not anticipate that non-performance-based compensation to be paid to [Quest's] executive officers in 2002 will exceed" the limit in Section 162(m). Id. ¶ 133. Although Plaintiff has not provided quoted language from subsequent proxy statements, Plaintiff alleges that the Compensation Committee made similar statements in the 2003 Proxy Statement as well as the proxy statement filed with the SEC on May 19, 2004 (the "2004 Proxy Statement"). Defendant Murdock signed the Compensation Committee reports in the 2002, 2003, and 2004 Proxy Statements.

The proxy statements between 2002 through 2005 all contained statements by the Board's Audit Committee, recommending that the audited financial statements from the previous fiscal year be included in the Company's Annual Report on Form 10–K for that year. Thus, the Audit Committee was endorsing the prior financial statements. Defendant Murdock signed the Audit Committee reports in the 2002, 2003, and 2004 Proxy Statements. Quest

also filed a proxy statement with the SEC on July 11, 2005 (the "2005 Proxy Statement"); Defendant Murdock signed the Audit Committee report in this statement as well.

Plaintiff alleges that the 2002 through 2005 Proxy Statements contained additional misstatements, e.g., by not disclosing the compensation granted via the allegedly backdated options, the Summary Compensation Tables from the proxy statements failed to reflect the proper compensation awarded to Defendants. Specifically, Plaintiff alleges that the 2002 Proxy Statement failed to report the compensation of (1) Defendant Garn in 2000 as a result of his option grants in 2000; (2) Defendants Smith, Doyle, Garn, Morse, and non-party Aronoff, as a result of their option grants in fiscal year 2001; and (3) Defendants Smith, Morse, and non-party Aronoff, as a result of their option grants in 2002. *Id.* ¶ 142. The amount of this unreported compensation is, according to Plaintiff, material.

Plaintiff alleges that the Company made additional similar material misstatements in the 2003, 2004, and 2005 Proxy Statements. As with the 2002 Proxy Statement, Plaintiff alleges that these misstatements were the result of the failure to disclose the compensation awarded via the option grants. *Id.* ¶¶ 142–44. From the 2003 Proxy Statement, Plaintiff alleges that Defendants failed to disclose the compensation given to (1) Defendants Smith, Doyle, Morse, and non-party Aronoff, as a result of the option grants received in 2001; and (2) Defendants Smith, Morse, and non-party Aronoff, as a result of the option grants received in 2002. *Id.* ¶ 142. From the 2004 Proxy Statement, Plaintiff alleges that Defendants failed to disclose the compensation given to (1) Defendants Smith, Garn, and Morse, as a result of the option grants received in 2001; and (2) Defendants Smith and Morse in fiscal year 2002 as a result of the option grants received in 2002. *Id.* ¶ 143. From the 2005 Proxy Statement, Plaintiff alleges that Defendants failed to disclose the compensation given to Defendants Smith and Morse in fiscal year 2002 as a result of options received in 2002. *Id.* ¶ 144.

Plaintiff has also alleged that several Form 4s' filed by Defendants were false and misleading in that the forms failed to represent the actual dates on which the options were granted. Specifically, the Form 4s' filed by Defendant Brooks on August 12, 2004, November 9, 2004, November 15, 2004, and February 8, 2005 were allegedly misleading, Additionally, the Form 4s' filed by Defendant Garn on December 12, 2005 and March 10, 2006 falsely represented the dates on which the options were granted.

**E. Reports of Backdating at Quest and Damage to Quest's Stock Price**

In May 2006, reports of possible backdating at Quest began to emerge. On May 19, 2006, a Goldman Sachs research report revealed that Quest had "highly suspicious" stock option grant dates. The Goldman Sachs report stated that management had explained that the grant dates at issue "are tied to specific board meetings and were thus not chosen at a later date." *Id.* ¶ 150 at 39:20–23. This report was published before trading began on May 19, 2006. During trading on May 19, Quest's stock price declined by 11.39%, from $15.98 per share to $14.16 per share. On May 22, 2006, after the close of trading, Quest issued a press release announcing the formation of a Special Committee (the "Special Committee") to investigate the stock option grant dates mentioned in the May 19, 2006 Goldman Sachs report. Quest's stock price dropped again to $13.32 per share. On June 1, 2006, Quest

announced that it had been contacted by the SEC regarding an informal inquiry relating to Quest's past stock option granting practices. Two weeks later, on June 14, 2006, Quest announced that H. John Dirks ("Dirks") was elected as a new director of Quest. The announcement also stated that Dirks would be a member of the Special Committee.

Before trading began on July 5, 2006, the Company issued a press release ("the July 5 Press Release") revealing that "the accounting measurement dates for many of the company's stock option grants awarded during the period from the fall of 1999 and into 2002 were actually obtained subsequent to the measurement dates used for financial reporting purposes." *Id.* ¶ 157. Thus, Quest's statement was a clear admission that the Company had discovered instances of stock option backdating. Moreover, "the Special Committee [ ] determined, based on its preliminary analysis, that non-cash stock-based compensation expense should have been recorded . . . and that the amount of such additional expense is expected to be material." *Id.* The July 5 Press Release also stated that the financial statements and the related reports "for the periods from 2000 through 2005 and for the quarter ended March 31, 2006 should no longer be relied upon." *Id.* ¶ 158. The July 5 Press Release noted that any restatements made as a result of the discovered backdating of stock options "would have the effect of decreasing reported amounts of income from operations, net income, net income per share and retained earnings contained in" the financial statements filed from 2000 through the quarter ending March 31, 2006. *Id.* ¶ 159.

Following the July 5 Press Release, the Company's stock dropped again to $12.86 per share at the end of trading on July 5, 2006. The drop in the Company's stock now totaled 20.10% since May 18, 2006, the last trading day before the Goldman Sachs report was released. Notably, Plaintiff stated in its FAC that this 20.10% drop in stock is not attributable to a general downturn in the market—between May 19, 2006 and July 5, 2006, the NASDAQ National Market (the exchange on which Quest's stock is traded) was up 3.18%, and the Russell 2000 Technology Index was down 2.29%. Both of these numbers are minimal compared to the 20.10% drop suffered by Defendants' stock.

Quest did not file a Form 10–Q for the second quarter of 2006. Instead Quest filed a Form NT 10–Q on August 10, 2006, stating that it would file restated financial statements for the periods from 2000 through the quarter ended March 31, 2006 as soon as practicable after the completion of the Special Committee's investigation. *Id.* ¶ 163. On August 17, 2006, Quest filed a Form 8–K stating that the failure to file a timely Form 10–Q had led NASDAQ to a determination that Quest would be delisted from the NASDAQ and that Quest had requested a hearing to review the decision. On October 26, 2006, Quest filed a Form 8–K reporting that Defendant Brooks had been reassigned from his role as Corporate Controller and Principal Accounting Officer of the Company as of October 20, 2006. The October 20, 2006 Form 8–K stated that the reassignment was "in connection with Quest's ongoing Special Committee investigation of stock option matters and was an interim decision pending completion of the Special Committee investigation and related restatement." *Id.* ¶ 165. On November 24, 2006, Morse, then Quest's Senior Vice President of Corporate Development, resigned from Quest. The purported reason for Morse's departure was his refusal to cooperate with the Special Committee investigating the option granting procedures.

On January 15, 2007, Quest issued a press release that the Special Committee

had reported the findings of its investigation into the stock option dating practices. The Special Committee concluded that "accounting measurement dates for most of the stock option grants to employees from July 1998 to May 2002 differed from the recorded grant dates." *Id.* ¶ 166. According to the Special Committee, the backdating of stock options ceased as soon as the Sarbanes–Oxley Act became effective. Additionally, the Company confirmed the need to restate some of the previously filed financial statements to properly "reflect the additional non-cash stock-based compensation expense that should have been recorded." *Id.* In this same press release the company confirmed its preliminary estimate of a non-cash stock-based compensation expense of $150 million through the period ending March 31, 2006. The Company further announced on January 15, 2007 that the Special Committee had directed the Company to reprice the ascertained offending stock options to an exercise price equal to the fair market value of the Company's common stock as of the corrected accounting measurement dates and to attempt to recover all or substantial portions of the after-tax gains the executive officers realized from the exercise of those stock options. Quest also announced that the NASDAQ Stock Market LLC has given Quest until September 17, 2007 to file all delinquent periodic reports necessary to regain compliance with the SEC periodic reporting requirements. *See* Stipulation and Order Re: Response and Briefing Schedule for Plaintiffs' Consolidated Am. Compl., *In re Quest Software, Inc. Deriv. Litig.*, SA CV 06–0751 DOC (RNBx), at 1:14–17.

## F. Quest's Violation of GAAP

The financial statements filed throughout the Class Period were represented by Quest as having been prepared in accordance with GAAP. However, Plaintiff claims that these statements and public statements about the Company's financial condition violated GAAP and SEC rules by failing to properly report and disclose the Company's stock-based compensation expenses and net income during the Class Period. Moreover, the magnitude of Defendants' alleged GAAP violations are substantial—currently estimated at $150 million. This estimate does not yet include the tax consequences or monetary tax obligations that will result from this additional expense and the effect on previous deductions taken under Internal Revenue Code Section 162m. Plaintiff has also alleged that, due to Quest's accounting errors, Quest presented its financial results and statements in a manner that violated numerous principles articulated by the Accounting Principles Board ("APB"). *See id.* at ¶¶ 178(a)(g).

## G. Motive and Profit from the Misconduct

Plaintiff has alleged that Defendants' motive for backdating the stock options was to profit from an artificially low purchase price on their stock purchases, and to further increase the profit by taking advantage of the artificially inflated stock price resulting from inflated net income reports. During the Class period, as noted by the respective From 4s': (1) Defendant Smith sold 445,300 shares for a total of $6,875,382.82; (2) Defendant Doyle sold 1,974,543 shares for a total of $27,679,352.74; (3) Defendant Garn sold 65,000 shares for a total of $983,700; (4) Defendant Murdock sold 202,274 shares for a total of $2,189,454.29; and (5) Defendant Brooks sold 57,620 shares for a total of $819,691.87. Collectively, Defendants Smith, Garn, Doyle, Murdock, and Brooks sold at least 2,744,737 shares of Quest stock during the Class Period for proceeds of approximately $38.5 million.

### H. Procedural Background

On March 26, 2007 Plaintiff filed its FAC. Plaintiff's FAC contains three claims against Quest and the Individual Defendants. Claim I is against Defendants Quest, Smith, Morse, Lambert, Doyle, Murdock, and Brooks for violation of § 10(b) of the Exchange Act and SEC Rule 10b–5 (securities fraud). Claim II is against Defendants Quest, Smith, Morse, Lambert, Garn, Doyle, Murdock, and Brooks for liability pursuant to § 20(a) of the Exchange Act (control person liability). Claim III is against Defendants Smith, Brooks, Garn, Doyle, and Murdock for violation of Section 20A of the Exchange Act (insider trading).

Having recited the relevant facts and allegations, the Court will now turn to the applicable legal standard.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted. Once it has adequately stated a claim, a plaintiff may support the allegations in its complaint with any set of facts consistent with those allegations. *Bell Atlantic Corp. v. Twombly*, —— U.S. ——, ——, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007); *see Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1988) (stating that a complaint should be dismissed only when it lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory). Dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief. *Bell Atlantic*, 127 S.Ct. at 1968 (abrogating *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

The Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir.2006); *Balistreri*, 901 F.2d at 699. Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003) (citing *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir.1996)); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.2000).

Additionally, fraud claims must be pled with more particularity than other claims. Federal Rule of Civil Procedure 9(b) provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "Rule 9(b) ensures that allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.1985). Rule 9(b) therefore requires that allegations of fraud identify the parties to the misrepresentation such that each defendant is on notice of what specifically they are accused of. *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir.1991).

Through the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress has imposed heightened pleading standards on securities fraud actions. 15 U.S.C. §§ 78u–4(b)(1), (2). "The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir.2002) (citing *Ronconi v. Lar-*

*kin*, 253 F.3d 423, 429 (9th Cir.2001)). "The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.' " *Id.* at 1084–85 (citing *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 973 (9th Cir.1999)). To meet this heightened pleading requirement, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* at 1085 (citing 15 U.S.C. §§ 78u–4(b)(1)).

▇▇▇ The second requirement of the PSLRA is that the complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* (citing 15 U.S.C. §§ 78u–4(b)(2)) (emphasis added). The Ninth Circuit has interpreted the scienter pleading requirement as meaning that plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics*, 183 F.3d at 974. The *Silicon Graphics* Court further clarified that "recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Id.* at 977. The requisite recklessness must be an "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it." *Id.* at 984. A plaintiff cannot proceed on pleadings averring scienter based on mere "motive and opportunity" but instead must "state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id.* at 979.

Recently, in *Tellabs v. Makor Issues & Rights, Ltd.*, —— U.S. ——, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), the Supreme Court elaborated on the PSLRA's "strong inference" standard for pleading scienter. Agreeing with the standard in the Ninth Circuit, the Court held that "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss .... The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509 (emphasis in original).

▇▇▇ Under the PSLRA "when determining whether plaintiffs have shown a strong inference of scienter, the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002). However, the "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences' .... [T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 127 S.Ct. at 2510. Thus, a "complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* (emphasis added).

## III. DISCUSSION

### A. Elements of Securities Fraud

▇ The Securities and Exchange Act of 1934 prohibits "(1) the 'use or employ[ment] ... of any ... deceptive de-

vice,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of' Securities and Exchange Commission 'rules and regulations.' " *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341, 125 S.Ct. 1627, 1630–31, 161 L.Ed.2d 577 (2005) (citing 15 U.S.C. § 78j(b)). Securities and Exchange Commission Rule 10b–5 makes it unlawful for any person, in connection with the purchase or sale of any security, to "make any untrue statement of a material fact" or to "omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(2004). "The courts have implied from these statutes and Rule a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation." *Dura*, 544 U.S. at 341, 125 S.Ct. 1627 (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 744, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). In addition, "Congress has imposed statutory requirements on that private action." *Id.* The Supreme Court has enumerated the following elements of a cause of action for securities fraud arising under section 10(b) and rule 10b–5:

(1) *a material misrepresentation (or omission), see Basic Inc. v. Levinson,* 485 U.S. 224, 231–232, 108 S.Ct. 978, 99 L.Ed.2d 194, . . . (1988);

(2) *scienter, i.e.,* a wrongful state of mind, *see Ernst & Ernst,* [425 U.S.] at 197, 199, 96 S.Ct. 1375 . . . ;

(3) *a connection with the purchase or sale of a security, see Blue Chip Stamps,* [421 U.S.] at 730–731, 95 S.Ct. 1917 . . . ;

(4) *reliance,* often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation,' *see Basic,* [485 U.S.] at 248–249, 108 S.Ct. 978 . . . (nonconclusively presuming that the price of a publicly traded share reflects a material misrepresentation and that plaintiffs have relied upon that misrepresentation as long as they would not have bought the share in its absence);

(5) *economic loss,* 15 U.S.C. § 78u–4(b)(4); and

(6) *'loss causation,' i.e.,* a causal connection between the material misrepresentation and the loss, [15 U.S.C. § 78u–4(b)(4) ]; cf. T. Hazen, Law of Securities Regulation, §§ 12.11[1], [3] (5th ed.2002).

*Dura,* 544 U.S. at 341, 125 S.Ct. 1627 (emphasis in original).

■ Of the six elements Plaintiff must allege to state a claim for securities fraud under § 10–b, Defendants only challenge the scienter element. *See* Defs.' Mem. of P. & A. in Supp. of Mot. to Dismiss First Am. Compl. 7:26–16:19 (hereinafter "Defs.' Mot."). Specifically, Defendants argue that Plaintiff has not pled scienter with the requisite degree of particularity required under the PSLRA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. *Id.* at 8:1–3. Both the Ninth Circuit and the Supreme Court have directed that determinations regarding the sufficiency of the scienter allegations in a complaint should be not be made by scrutinizing "each allegation in isolation[,] but [by] assess[ing] all the allegations holistically." *Tellabs,* 127 S.Ct. at 2511. Moreover, this "holistic determination" must be made by determining whether Plaintiff has "pled facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Id.* at 2513 (emphasis added). Thus, for purposes of this order, the Court will analyze each of the relevant facts and allegations individually, and then weigh them in their totality to determine whether the scienter requirement has been sufficiently pled. For the reasons set forth below, the Court

concludes that Plaintiff has sufficiently pled scienter.

It should be noted at the outset, however, that Defendants misapprehend the nature of the *Tellabs* decision and its effect on the PSLRA standard within the Ninth Circuit. Defendants claim in their Reply to Plaintiff's Opposition that the *Tellabs'* mandate that courts take "into account plausible opposing inferences" somehow elevates the PSLRA pleading standard above the prior Ninth Circuit standard. *See* Defs.' Reply in Supp. of Mot. to Dismiss First Am. Compl. at 3:24–27, 4:8–10 (hereinafter "Defs.' Reply"). While the Supreme Court's holding in *Tellabs* requiring courts to consider "plausible opposing inferences" *may* have raised the standard in other circuits, in *Gompper*, cited in Defendant's own Motion at 7:13–14, 12:28, and 15:12, the Ninth Circuit held that *"all* reasonable inferences must be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper*, 298 F.3d at 897 (emphasis in original). Moreover, the *Gompper* Court held that a court "should consider all the allegations in their entirety" to determine whether "the plaintiffs' complaint gives rise to the requisite inference of scienter." *Id.* In citing to *Gompper*, the *Tellabs'* Court held that the inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, *not* whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 127 S.Ct. at 2509. Thus, in *Tellabs* the Supreme Court explicitly approved the Ninth Circuit's *Gompper* standard. Given that the Ninth Circuit language is virtually identical to the language in *Tellabs*, and the *Tellabs* court *cited to Gompper* in relation to this holding, Defendants' claim that *Tellabs* somehow elevated the pleading standard is incorrect and ironic given that Section II(A) of Defendants' Reply is entitled "Plaintiff Misapprehends the Pleading Standard."

## B. Backdated Stock Options

The Court finds the backdated stock options and the concurrent practices of the option-granting employees are highly suspicious and concludes that both lean heavily toward a finding of scienter. Quest has admitted that "accounting measurement dates for most of the stock option grants to employees from July 1998 and May 2002 differed from the recorded grant dates." *See* Compl. ¶ 166. Defendants argue that despite this admission, the backdated options are insufficient to plead scienter because the granting procedures are "highly technical," and the backdating is the result of "the complexity of accounting for equity-based compensation." Defs.' Mot. at 10:25–26 n. 5; Defs.' Reply at 10:5–6. Defendants' argument is unpersuasive.

The option grants at issue are those granted on April 14, 2000, March 28, 2001, April 4, 2001, October 1, 2001, August 6, 2002, and August 7, 2002. The first date, April 14, 2000, was the lowest price for Quest stock in 2000. The March 28, 2001 stock price preceded one of the steepest rises in the trading history for Quest's common stock, a 143.09% rise over the next month. On April 4, 2001, one week after the March 28, 2001 option grants, Quest issued additional options. April 4, 2001 was the lowest stock price per share for the first six months of that year. As with the March 28, 2001 option grants, this stock price also preceded one of the steepest rises in trading history for Quest's common stock, a 123.16% rise over the next month. The options granted on October 1, 2001 were granted at a price that was within two trading days of the lowest stock price per share of Quest's stock in 2001. Indeed, the issue price was a mere three cents higher than the lowest price for the year; a marginal sum given the October 1, 2001 price of $10.74 per share for Quest's common stock. The option

grants dated August 6, 2002 were within one day of the lowest price per share of Quest's stock for the first eight months of that year. One month later, Quest's stock price had risen 33.45%. Finally, options were also granted on August 7, 2002. One month after this date, Quest's stock price had risen 34.94%. Plaintiff has not alleged any improper option granting dates after August 7, 2002; but instead has suggested that the lack of any additional dates from August 7, 2002 to the end of the class period (July 3, 2006) is a direct result of the option reporting provisions of SOX becoming effective at the end of August 2002. For an additional discussion of the Plaintiff's allegations regarding the ramifications of SOX, *see* Section II(B), *infra.*

At first glance, these extremely fortunate dates give rise to a strong inference that backdating has occurred and that it was done intentionally. The dates supplied in Plaintiff's FAC all appear to reflect either the lowest prices for a period exceeding six months, or are prices that immediately proceeded rapid increases in the price of Quest's stock. The fact that none of the option grant dates resulted in less-than-favorable results for Defendants also gives rise to a strong suggestion that the improper dating of options was intentional.

Moreover, to see the rather remarkable results of the "highly technical" accounting treatments, one need only look at the stock charts reproduced in Plaintiff's FAC. *See* Pl.'s First Am. Compl. 3:6–12, 4:7–14, and 5:1–8. When these stock charts reflecting Quest stock's price history are overlaid with demarcations reflecting the date of the option grants at issue (as has been done in Plaintiff's FAC), the presence of backdating becomes abundantly clear. The graphical representation lends substantial support to the notion that no amount of "highly technical" accounting treatments can obscure the obvious that

someone at Quest was engaging in substantial, prolonged, and *intentional* backdating of stock options. In the parlance of the *Tellabs* holding, the Court can definitively state that the inference that intentional backdating occurred at Quest is more "cogent and compelling" than any opposing inference offered by Defendant. Thus, in accordance with Ninth Circuit precedent, the question then becomes whether Plaintiff has adequately pled that Defendants' either knew of the backdating, or were deliberately reckless in not knowing of the backdating.

### C. Defendants' Knowledge of Backdated Options

The Court finds that Defendants either knew or were deliberately reckless in not knowing that the purported option grant dates were improper. Given the extremely beneficial option grant dates, the Individual Defendants' respective executive positions in the Company, and the substantial number of shares awarded to the various Defendants during and before the Class Period, the Court finds that Plaintiff has sufficiently pled a "strong inference" that Defendants knew or were deliberately reckless in not knowing that the purported option grant dates were improper. *See Gompper,* 298 F.3d at 897. Nevertheless, as the Court is required to consider *all* inferences, not just those that are beneficial to Plaintiff, the Court will now turn to Defendants' arguments. *See id.*

Defendants have argued in their moving papers that the method of accounting for options is "highly technical." Defs.' Mot. 10:23–28 n. 5. Moreover, Defendants argue that Plaintiff has failed to allege that each Defendant knew that the accounting measurement date for any option grant differed from the grant date. In support of this argument, Defendants assert that the Individual Defendants "would have to know

that the process or methodologies that the Company used produced different accounting measurement and grant dates." *Id.* Here the Individual Defendants reaped substantial rewards as a result of the backdating, and thus they knew how favorable the option grant dates were, such that they didn't need to understand the process and methodology to know that the dates were improper.

Under these circumstances, the Court finds it highly improbable that a failure to comprehend the proper accounting treatment of stock options would so consistently benefit Defendants. Regardless of whether the accounting is "highly technical," it can not cause option grant dates to mysteriously fall on some of the lowest priced dates of 2000, 2001, and 2002 without someone's influence. Indeed, were such determinations as complex as Defendants argue, it would be expected that the option measurement dates would occasionally be detrimental to Defendants. When the absence of detrimental measurement dates is combined with the fact that Defendants were some of the primary beneficiaries of the backdated options, and also held key positions to control the measurement dates, the conclusion is that Defendants likely influenced the grant dates, and thus, likely knew of the improper backdating. Although "likely knew" is insufficient for purposes of the PSLRA, actual knowledge is not the only mental state that satisfies the PSLRA.

A strong showing of scienter can also be adequately pled if the complaint pleads "deliberate recklessness" in lieu of actual knowledge. *Silicon Graphics,* 183 F.3d at 974. Collectively, Defendants were the recipients of literally millions of option grants between 1998 and 2002. This fact, standing in isolation, is insufficient to establish "deliberate recklessness." However, Plaintiff's FAC specifies the precise number of options received by Defendants on the respective improper grant dates. *See* Pl.'s First Am. Compl. ¶¶ 91–97. Indeed, it is simply incomprehensible that for such large option grants Defendants would not have been keenly aware of the option measurement date and the resulting value of the option grants. Given that Defendants' respective positions on the Compensation Committee, Audit Committee, as CFOs, etc., would have given Defendants detailed knowledge of when the options were actually granted, and given that the Court has already found (in no small part because of the press release issued by Quest itself) that extensive backdating occurred, Plaintiff's FAC has adequately pled that Defendants would have known or were deliberately reckless in not knowing about the backdated options. Thus, Plaintiff has pled a strong inference of scienter. Although this inference of scienter is compelling, to survive at this stage the inference must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 127 S.Ct. at 2510.

Defendants argue that even if they were aware of the improper measurement dates of the options, this is not sufficient to demonstrate deliberate recklessness, as the Individual Defendants were not aware of the proper accounting treatments for option measurement dates. However, as previously stated, the Court finds that the measurement dates for determining when an option was effectively granted are not so complex as to cause confusion on the part of sophisticated public company executives. To be clear, the Court is *not* relying on a *de facto* rule that scienter is sufficiently pled if the option grants were given to those at the executive level within the company; nor is the Court relying on a *de facto* rule that option measurement date calculations are not inherently complex. Rather, the Court finds that the substantial number and value of the option grants

given to Defendants that consistently had measurement dates on either the lowest prices of the year or immediately proceeding rapid rises in the Company's stock, combined with Defendant's key positions relating to both the granting of and/or accounting for stock options gives rise to a compelling inference of either Defendants' actual knowledge or deliberate recklessness.[2]

Plaintiff's allegations regarding Defendants' knowledge is further supported by the interplay between the effective date of the Sarbanes–Oxley Act and the timing of Defendants' use of improper measurement dates. Plaintiff has alleged that the last options to be backdated were those options for which the measurement date was changed to August 6 and 7, 2002. The reason, according to Plaintiff is the effective date of SOX. After August 30, 2002, the effective date of Sarbanes–Oxley § 403, stock option grants were required to be reported within two business days. Plaintiff alleges that § 403 meant that Defendants could no longer engage in the practice of looking back over the course of the fiscal year to choose the most beneficial dates as option measurement dates. See Pl.'s First Am. Compl. ¶ 196. Defendant counters that an innocent explanation exists: Quest's option granting procedures did, in fact, involve a certain degree of hindsight, and the passage of SOX effectively prohibited these procedures. In light of the remarkably fortuitous option grant dates Plaintiff describes (see id. at 2:20–5:9 and 25:25–27:13), Defendants argument is highly implausible. As Defendant's argument is neither as cogent nor as compelling as Plaintiff's pleadings, the

Court finds that Plaintiff has adequately pled that Defendants either had knowledge of or were deliberately reckless in the determination of stock option measurement dates.

### D. Defendants' Stock Sales

The next issue is whether Defendants' stock sales can be considered "suspicious" to support a finding of scienter. Plaintiff has alleged that five of the seven individual Defendants (Smith, Brooks, Garn, Doyle, and Murdock) have sold, in total, at least 2,744,737 shares of Quest common stock during the Class Period for proceeds totaling approximately $38,547,581.72. Pl.'s First Am. Compl. ¶ 191. At a glance, the rather substantial number of shares sold and the resulting proceeds suggest a possible motive for the backdating such that the stock sales support an inference of scienter. However, as Defendants have correctly noted, these facts alone, without qualification or explanation, are insufficient under Ninth Circuit precedent. "[I]nsider trading is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir.2001) (quoting In re Silicon Graphics, 183 F.3d at 986 (quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1117 (9th Cir.1989)). To make this determination, Courts must consider three relevant factors: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading

---

**2.** It is important to stress that the Court is not finding that Defendant's positions alone are sufficient to establish scienter. To do so would be contrary to established Ninth Circuit precedent. See In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1087 (9th Cir.2002). Instead the Court is only concluding that De-

fendants' positions, when combined with the relevant circumstances, suggests an inference of scienter. To be clear, it is this combination with other particularized facts that may allow the Court to find that scienter has been adequately pled.

history." *Ronconi v. Larkin,* 253 F.3d 423, 435 (9th Cir.2001).

### i. Amount and Percentage of Shares Sold By Insiders

Plaintiff has pled with particularity the amount of shares sold by the respective Defendants, but not the percentage. *See* Pl.'s First Am. Compl. pp. 52–61. Plaintiff has listed the precise number of shares sold, the dates on which the shares were sold, the price for which the shares were sold, and the resulting earnings by each Defendant. *Id.* Plaintiff has not, however, alleged what percentage of each Defendant's shares were sold.

Typically, courts consider the percentage of shares sold to determine whether insiders are taking advantage of insider knowledge regarding a scheme that will artificially inflate the company's price. *See generally, Ronconi v. Larkin,* 253 F.3d 423, 435 (9th Cir.2001). Thus, for the insiders to benefit from the artificially inflated stock prices, they must sell their stock before the scheme or "truth" becomes public and reduces the stock price. In prototypical cases of insider trading, the scheme is of a limited or relatively short duration; e.g., insiders knowingly misrepresenting upcoming financial reports, insiders with information of a planned, but unreleased disclosure that will have a dramatic negative effect on the Company's stock, etc. Thus, for the insiders to benefit from the scheme, they must act quickly to sell their stock before the scheme becomes public and lowers the stock price. In turn, for the insiders to maximize their benefit, the insiders will sell large percentages of their stock.

There is no such prototypical scenario here.[3] Rather, Defendants were engaged in backdating options for at least four years. As the alleged scheme took place over several years, there was no reason for Defendants to quickly sell large percentages of their shares. Indeed, if Defendants had been successful in maintaining this scheme, the public would not have become aware of the improperly dated options. Moreover, large sales of stock options may have actually raised suspicion, thereby causing the scheme to be detected earlier.

■■■■ Defendants also had no reason to believe that they needed to sell large percentages of their stock. Unlike insiders in other cases who know that the then-inside information will eventually be disclosed to the public, resulting in a drop in the stock price, and thus, requiring them to sell large portions of stock to maximize their profit, in this case it was not inevitable that the improperly-dated stock options would be revealed. Thus, the requirement that percentages be pled is only relevant when the insider is aware of the time that the inside information will be disclosed and there will be a resulting effect on the stock price. Assuming that the inside information will not be disclosed, the insider has no incentive to sell a large portion of his or her shares in order to maximize profit because the inside-information will not reach the marketplace, and thus will not have a negative effect on the stock price. Without a foreseeable negative impact on the stock price, large percentages of stock need not be sold to achieve a substantial profit.

Unlike in the prototypical scenario in which insiders would know the precise date of public disclosure, and could sell large portions of their stock before the disclosure, here the disclosure of Quest's backdating came without any forewarning to Defendants. In fact, Plaintiff alleges the eventual disclosure of the improperly-dated stock options was initially triggered

---

**3.** Pre–SOX backdating schemes generally will not fit within this prototypical scenario.

by the May 19, 2006 Goldman Sachs report that revealed Quest's "highly suspicious" stock option grant dates. It appears that Defendants did not know when or even if this report would be released; it is therefore unsurprising that Defendants did not sell large percentages of their stock before knowledge of Quest's backdating practices was disseminated through the market. Thus, the fact that Plaintiff has not alleged that Defendants sold large percentages of their stock is without consequence. Because Plaintiff has pled the amount of stock sales with the appropriate degree of specificity, and the amount is substantial enough to justify an inference of motive, this sub-factor leans in favor of finding the stock sales "suspicious."

### ii. Timing of the Sales

Plaintiff has pled with a sufficient degree of specificity precisely when Defendants sold shares of their stock. Traditionally, this factor, however, is not only concerned with the date on which the insider's shares were sold, but rather when the shares were sold in relation to the revelation of the inside-information. *See generally, Ronconi v. Larkin,* 253 F.3d 423, 435 (9th Cir.2001). As previously described, the nature of Defendants' alleged scheme was such that there was no preordained date on which the allegations of improper backdating would be revealed with the resulting drop in stock price. The facts of this case do not lend themselves to analysis under this factor for two reasons. First, as previously stated, unlike the prototypical scenario where insiders are aware of the precise disclosure date for inside information, here Defendants were not aware of the date on which Quest's backdating practice would be revealed. Accordingly, Defendants' stock sales will not reflect large sales prior to the disclosure. Second, unlike the prototypical scenario, the nature of Defendants' scheme does not depend on timing; regardless of when the stock is sold, the fact that the stock was granted at such a relatively low price virtually guarantees Defendants will reap significant profits.

Nevertheless, if applied to the facts at hand, it is apparent that after the disclosure of Quest's backdating, Defendants were in a catch-22. If Defendants sold large quantities of their remaining shares shortly after the reports of backdating began to disseminate throughout the market, but before the negative impact of the revelations affected the stock, Defendants' actions would have caused a strong appearance of impropriety. If Defendants waited until after the disclosure to sell their shares over time, however, they would be forced to sell after the stock prices had declined. Accordingly, there was no positive action for Defendants to take once the backdating practice was made public. Thus, the fact that Plaintiff has not pled facts relating to the timing of Defendants sales' is of little significance and this factor neither weighs for nor against a finding of suspicious stock sales.

### iii. Whether the Sales were Consistent with the Insider's Prior Trading History

Plaintiff's FAC does not plead any of Defendants' pre-Class Period stock trading activity. The failure to plead this factor could be highly damaging to Plaintiff's assertion that the stock sales were "suspicious." Yet here this factor is effectively moot. Plaintiff's Opposition notes that but for the five year statute of limitations, the Class Period would have began "with the commencement of public trading of Quest stock." Pl.'s Opp. to Defs.' Mem. of P. & A. in Supp. of Mot. to Dismiss FAC 17:14–15. This is due to the fact that Plaintiff alleges that option backdating began before the Company had gone public in 1999. *See id.* 17:11–17. Thus, the crux of Plain-

tiff's argument is that because Defendants were backdating options during the *entire* pre-Class Period, the fact that Plaintiff has not demonstrated that the sales were consistent with Defendants' prior trading history is effectively meaningless as there is no trading period without the influence of backdated options with which to compare the sales. The Court finds this argument persuasive, and thus finds that this factor neither weighs for nor against a finding of suspicious stock sales.

### iv. Totality of Factors

Given that the first factor, "amount of shares sold" weighs in favor of a finding that the stock sales provided a motive for Defendants' backdating, and that the second and third factors neither weigh for nor against a finding of suspicious stock sales, the Court finds that the stock sales are "suspicious," and thus provide a possible motive for Defendants' actions. Nonetheless, as with several of the other circumstances mentioned, this determination standing alone is insufficient to establish scienter; further analysis is required.

### E. Departure and Reassignment of Quest Employees

■ While Plaintiff's allegations regarding Brooks' reassignment do not support a finding of scienter, the allegations about Morse's resignation lean heavily towards a finding of scienter. By Quest's own admission, Brooks was reassigned from his position as Quest's chief accounting officer in connection with the Special Committee's investigation. The reassignment of Brooks is not inherently suspicious. Given that Brooks' failure to properly account for the option grants resulted in a $150 million reduction in Quest's net income requiring Quest to restate several years of financial statements, it is not at all surprising that Brooks would be reassigned. The reassignment does not, however, require the conclusion that Brooks

was either reckless or aware of the improperly dated option grants. It is just as plausible that Brooks was either negligent or grossly negligent—neither of which are sufficient under the PSLRA and Ninth Circuit precedent. Indeed, while the magnitude of the restated financial reports combined with Brooks' reassignment lends additional credence to the inference that Brooks was aware of the improperly dated options, it does not necessarily lead to the inference that Brooks' was reassigned due to impropriety. Accordingly, this circumstance is of little significance. *See DSAM Global Value Fund v. Altris Software*, 288 F.3d 385, 391 (9th Cir.2002).

■ The departure of Morse is, however, far more troubling. Plaintiff has pled, and Defendants do not contest that Morse, the former CFO of Quest, refused to cooperate with the Special Committee, and instead chose to resign from Quest. Defendants have not offered any plausible alternative inferences. Instead, Defendants direct the Court to two cases: *In re Cornerstone Propane Partners, L.P., Sec. Litig.*, 355 F.Supp.2d 1069 (N.D.Cal.2005) and *In re Hypercom Corp. Sec. Litig.*, No. CV–05–0455–PHX–NVW, 2006 WL 1836181, 2006 U.S. Dist. LEXIS 45482 (D.Ariz. July 5, 2006). Although unclear, Defendants appear to be arguing one of two theories. Either Defendants are arguing that these cases stand for the proposition that executive-level resignations without more do not *create or help to create* an inference of scienter, or Defendants are arguing that executive-level resignations *cannot* create an inference of scienter. *See* Defs.' Mot. 16:3–4. Regardless of which of these arguments Defendants are making, Defendants' reliance on both of these cases is misplaced.

The facts of *In re Cornerstone Propane Partners, L.P., Sec. Litig.* are too dissimilar to provide a useful analogy. In *Cor-*

*nerstone* the individual defendants either resigned or were terminated (the parties' claims differed) as a direct result of the company's corresponding need to restate financial results. Assuming for the moment that the individual defendants in that case resigned, they did not do so to avoid cooperating with the company's financial restatement process. Instead the *Cornerstone* court specifically stated that these resignations were "expected after restatements and other adverse business events." *In re Cornerstone*, 355 F.Supp.2d at 1092. The court thus implied that resignations following financial restatements may be normal results of internal pressure, and, as such there is no suggestion of impropriety. This is not the case here. Morse did not resign because of internal pressure, but instead resigned specifically to avoid cooperating with the Special Committee—a body created to investigate potential impropriety.

The facts of *In re Hypercom Corp. Sec. Litig.* are also dissimilar. The plaintiffs in *Hypercom* alleged that the bare resignation by the company's former CFO was evidence of scienter. The *Hypercom* court gave little weight to this assertion because the CFO "was not fired for cause, and Hypercom did not publicly offer a reason ... for his resignation." *In re Hypercom Corp. Sec. Litig.*, 2006 WL 1836181, *8, 2006 U.S. Dist. LEXIS 45482, at *27. Such is not the case here. Plaintiff has pled, and Defendants have not denied that Morse refused to cooperate with the Special Committee and resigned. *See* Pl.'s FAC ¶ 198. Thus, unlike the plaintiffs in *Hypercom*, Plaintiff here has offered a plausible, unchallenged, and highly suspicious reason for Morse's resignation from Quest.

Although the Court finds that the reassignment of Brooks does not lean towards a finding of scienter, Defendants have not offered any plausible argument to cause

the reassignment of Brooks to lean away from a finding of scienter either. Therefore Brooks' reassignment is neutral. Nevertheless, the Court finds that Morse's resignation is highly suspicious. As such, this fact leans heavily towards a finding of scienter.

## F. Financial Statements

 In addition to the particularity requirement of the PSLRA, scienter is properly alleged when the complaint alleges both false statements and the defendants' involvement in the preparation of those statements. *See In re Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1023 (9th Cir.2005). Further, "[t]he most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *In re Exodus Commc'ns Inc. Sec. Litig.*, No. C 01–2661 MMC, 160, 163, 2005 WL 1869289, at *5 (N.D.Cal. Aug. 5, 2005) (citation omitted). Applied to option backdating, a " 'general allegation' that a particular practice 'resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation'; rather, 'the plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position.' " *Id.* at *15 (N.D.Cal. Aug. 5, 2005) (citing *In re Daou* at 1016, 1018).

It has already been established for purposes of this motion that Defendants knew or were deliberately reckless in not knowing of the backdated option grants. Accordingly, in order to establish scienter, the question is whether Defendants knew or were deliberately reckless in not knowing that the backdated options would have a material effect on the financial reports.

Based upon the Special Committee's investigation, Plaintiff has pled that the total compensation expense that should have been reported as a result of the option grants is $150 million ("the total unreported expense"). The total unreported expense, $150 million, is clearly material. Such a large expense is material regardless of whether it is compared to the overall market capitalization of the company or the company's annual net income.

■ Although the total unreported expense is clearly material, it has not been stated with the requisite degree of particularity under the PSLRA. To properly determine the culpability of the Individual Defendants, the complaint must state what the unreported expense was for each individual year that improperly granted options were given. Without this fact, it is difficult to determine whether the Individual Defendants were deliberately reckless. For example, if a substantial portion of the total unreported expense was accrued in one specific year, then a determination of who was acting with deliberate recklessness will be different than if the total unreported expense accrued proportionally over numerous years. As stated by U.S. District Judge Patel,

> "Yet, by failing to provide any allegations of time frames by which defendants knew of facts that would undermine the truth of their public disclosures, plaintiffs have not alleged that defendants possessed the requisite mental state. As currently written, the complaint fails the particularity requirement, lacking clear allegations establishing who knew what and when."

*In re Cornerstone Propane Partners*, 355 F.Supp.2d 1069, 1082 (N.D.Cal.2005).

■ Nevertheless, Plaintiff has alleged that Defendants Smith, Morse, Doyle, Murdock, and Brooks were all present through, at least, a substantial portion of

the relevant time period. These Defendants were present while backdating was taking place, and these Defendants failed to report a compensation expense that, as of 2006, was estimated at $150 million. Thus, although the omission of a breakdown of the misstated amounts for each financial statement weakens the inference of scienter, the magnitude of the unreported compensation expense, combined with the aforementioned Defendants' presence at the company during the time the unreported expense was accruing supports an inference of scienter.

Under Ninth Circuit precedent, a "later statement may suggest that a defendant had a contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Read–Rite Corp. Sec. Litig.*, 335 F.3d 843 (9th Cir.2003) (citing *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996–97 (9th Cir.1999)). Pursuant to 18 U.S.C. § 1350(a), several individual Defendants signed the SOX Certifications between 2002 and 2006. SOX Certifications require the CEO and CFO to sign a statement that certifies "that the periodic report containing the financial statements fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act [o]f 1934 (15 U.S.C. 78m or 78o (d)) and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer." 18 U.S.C. § 1350(b). For these certifications to have any substance, signatories to the certifications must be held accountable for the statements. *See Howard v. Everex*, 228 F.3d 1057, 1061 (9th Cir.2000). It would be wholly inappropriate to permit a signatory to evade liability because he/she did not prepare the financial report, as Defendants argue, on the ground that the signatory was unaware of the misstatements

made therein. To hold otherwise would effectively eviscerate the entire substance of 18 U.S.C. § 1350, the purpose of which is to ensure that regardless of who prepared the statements, the signatories are attesting to their accuracy and reliability. Additionally, several Defendants also signed proxy forms and other publicly reported financial disclosures. The financial disclosures, proxy statements, and SOX Certifications are clearly "statements" for the purposes of establishing contemporaneous knowledge. Given that the Company is currently in the process of restating numerous financial reports, contemporaneous knowledge of the financial reports signed by the Individual Defendants can be inferred.

Second, Defendants were aware of the 1999 Plan that was operative during the period in which the improper option grants were awarded. The 1999 Plan makes clear that all option grants are to be awarded at 100% of the fair market value as of the measurement date. The substantial unreported compensation expense indicates that the option grants clearly violated the 1999 Plan. Even if Defendants were not aware of the "highly technical" accounting treatment required for determining the option measurement dates, Defendants should have been aware of their own 1999 Stock Option Plan. Thus, Defendants were either unaware of the Plan, or disregarded it. Given the Defendants' respective positions and duties with respect to options, and the number of grants Defendants received under the 1999 Plan, if Defendants were not aware of the 1999 Plan, they would be deliberately reckless. Alternatively, if Defendants were aware of the Plan but disregarded it, then they are effectively admitting they knew that the options were being granted at less than fair market value in violation of the 1999 Plan, and thus were deliberately reckless in not recording a compensation expense. In either case, a strong suggestion of at *least* deliberate recklessness has been shown.

Defendants stress that there was a lack of knowledge of impropriety because all of the Company's financial statements were audited. Defs.' Reply at 10:11–13. The fact that the financial statements were audited is insufficient to negate a finding of knowledge or deliberate recklessness on the part of Defendants. Neither Defendants' Motion nor Reply states who performed the audits, whether the auditors were members of the board, whether the auditors were recipients of option grants, or whether auditing was done by an outside body hired by Quest. Plaintiff, however, has alleged that one of the members involved in the option backdating practices was also a member of the Audit Committee. To borrow from a colloquialism, this case presents a situation where the wolves were guarding the henhouse. Instead of protecting the company from reporting improper financial statements, those responsible for supervising and auditing the financial statements were the very same people facilitating and benefitting from Quest's financial improprieties.

There is, however, one exception. Plaintiff's allegations regarding Defendant Lambert are insufficient as currently pled. Plaintiff argues that the Individual Defendants' wrongdoing extends beyond the final backdated option grant date (August 7, 2002) because the Individual Defendants failed to disclose the compensation expense in financial statements filed after the backdating practices ceased. Plaintiff's theory thus requires that despite this knowledge the Individual Defendants were aware of the option backdating scheme such that after the backdating practice terminated, the Individual Defendants continued to fail to report the corresponding compensation expense. However, this theory can not readily be applied to Lambert.

Lambert joined Quest in January 2004, nearly a year and a half after the last backdated option was granted. Even assuming that the Individual Defendants waited until the end of the 2002 fiscal year to report the last set of backdated options, this report would likely have been made no later than March 31, 2003, the date on which Quest filed its 2002 10–K. Thus the last backdated options would have been reported eight full months before Lambert became Quest's Senior Vice President of Finance. This extended period of time makes it unlikely that Lambert knew of the backdating practices that had taken place a year and a half before his arrival at Quest.

### G. Totality of Circumstances Regarding Plaintiff's 10b–5 Claim

Plaintiff has pled numerous particularized facts. Under *Tellabs* and *Gompper* the Court must consider these facts in their totality. Plaintiff's FAC has adequately pled the following facts that support a finding of scienter: (1) that backdating existed; (2) that Defendants had knowledge or were deliberately reckless in not knowing that the options were backdated; (3) that Defendants stock sales were highly suspicious; and (4) the departure of Quest's former CFO Morse was suspicious. Although lack of allegations regarding the resulting financial impact weigh against a finding of a strong inference of scienter, the Court finds that the abundance of facts supporting a strong inference of scienter substantially outweigh this minor defect. Accordingly, Defendants' motion to dismiss Plaintiff's 10b–5 claim is DENIED IN PART with respect to Defendants Quest, Smith, Morse, Doyle, Murdock, and Brooks ("10b–5 Defendants").

Regardless of the Court imputing recklessness, Plaintiff's FAC has failed to adequately plead why Lambert has been included as Defendant for Plaintiff's 10b–5

claim. Although he signed several financial statements, his tenure at Quest began a year and a half after the options backdating practice ceased. And, while inferences can be made regarding the mental state of the other Individual Defendants, the allegations in Plaintiff's FAC are insufficient to allow such an inference as to Lambert. Accordingly, Defendants' Motion to dismiss Plaintiff's 10b–5 claim is GRANTED and DISMISSED WITHOUT PREJUDICE with respect to Defendant Lambert.

### H. Scheme Liability

The Court finds that Plaintiff has adequately alleged scheme liability. In their papers, Defendants have challenged the sufficiency of Plaintiff's allegations regarding Defendants' purpose in granting the backdated options and filing the subsequent incorrect financial statements. *See* Defs.' Mot. at 17:1–19. Specifically, Defendants argue that Plaintiff has not sufficiently pled that "Defendants' 'purpose' in undertaking these routing [sic, should likely be 'routine'] corporate functions was to defraud shareholders." *Id.* at 17:20–21.

To properly allege scheme liability, a plaintiff must show that each defendant is a "primary violator;" there is no private cause of action for "aiding and abetting" a violation. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver N.A.*, 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *Simpson v. AOL Time Warner*, 452 F.3d 1040, 1048 (9th Cir.2006). In the Ninth Circuit, "to be liable as a primary violator of § 10(b) for participation in a 'scheme to defraud,' the defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Id.* at 1048. Moreover, "it is not enough that a *transaction* in which defendant was in-

volved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect." *Id.* (footnote omitted) (emphasis in original). Thus, the Ninth Circuit has held that "[i]f a defendant's conduct or role in an illegitimate transaction has the principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme to defraud, then the defendant is using or employing a deceptive device within the meaning of § 10(b)." *Id.* at 1050. When determining whether a defendant is a primary violator, the Ninth Circuit has directed district courts to view the defendant's individual conduct in isolation. *Id.*

The scheme Plaintiff alleges is quite simple: the 10b–5 Defendants "caused Quest to issue false and/or misleading statements in its public filings, which led shareholders and the investing public to falsely believe that Quest's accounting was in compliance with GAAP and that Quest was only issuing stock options to its executives/directors in accordance with" the 1999 Plan. Pl.'s Opp'n 22:5–8. Plaintiff has further alleged that the 10b–5 Defendants' purpose in causing Quest to file misstated financial results was equally simple: "to conceal that Quest executives were receiving backdated options in clear violation of the [1999] Plan, and that Quest was failing to properly account" for the resulting compensation. Pl.'s Opp'n 22:19–20; *see also* Pl.'s First Am. Compl. ¶¶ 180–200. The question now becomes whether each 10b–5 Defendant's conduct had "the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme."

The financial statements and SOX Certifications filed with the SEC during the class period were the primary method of perpetuating this scheme. The Court has already found that the 10b–5 Defendants either knew or were deliberately reckless in not knowing that options were being backdated and that this would result in material misstatements of financial results. *See* § III(F), *supra.* Accordingly, any 10b–5 Defendant who signed these financial disclosures or SOX certifications will be considered to have had the primary purpose of perpetuating the scheme by creating a false appearance of fact; i.e., Quest's inflated earnings. Thus, as 10b–5 Defendants Smith, Morse, Doyle, Brooks, and Murdock each signed financial disclosures or SOX certifications, they are all "primary violators." *See* § I(A), *supra.* Additionally, as financial statements can be attributed to Quest itself, Quest is also a "primary violator." *See Howard v. Everex Sys.,* 228 F.3d 1057, 1065 (9th Cir.2000) (finding that a company can be a primary violator); *see also Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1396 (9th Cir. 1993).

To be clear, the Court is not finding that any signatory to a misstated financial statement or SOX certification necessarily has the purpose of concealing wrongdoing. Rather, it is signing false financial statements or SOX certifications *combined with* the fact that the Court has already found that Plaintiff has adequately pled the 10b–5 Defendants were deliberately reckless in not knowing of the materially adverse effect the option backdating practices would have on the financial statements that results in the Court's finding that 10b–5 Defendants are "primary violators" for purposes of establishing scheme liability. As the 10b–5 Defendants are "primary violators" with purpose of defrauding shareholders by signing false financial disclosures and SOX Certifications, the Court finds that Plaintiff has adequately alleged scheme liability against the 10b–5 Defendants.

## I. Plaintiff's § 20(a) Claim

 Count II of Plaintiff's FAC alleges "control person liability" against Defendants Quest, Smith, Morse, Lambert, Doyle, Murdock, Brooks, and Garn. The Court finds that Plaintiff has sufficiently pled the § 20(a) Claim with respect to some defendants. To establish liability under § 20(a), plaintiff must show: "(1) a primary violation of federal securities laws ... and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir.2000) (citation omitted). Defendants make three arguments that address Plaintiff's § 20(a) claim. First, Defendants argue that Plaintiff has failed "to allege a cognizable Rule 10b–5 claim against any defendant...." Defs.' Mot. at 17:26–27. Second, Defendants argue that Plaintiff failed to plead with the requisite particularity that the Individual Defendants engaged in any culpable conduct. Finally, Defendants argue that Plaintiff has not plead with particularity a "primary violator," and that Plaintiff has not and cannot plead control over a "primary violator." As the Court has already found that Plaintiff has adequately alleged a Rule 10b–5 claim against Quest, Smith, Morse, Doyle, Murdock, and Brooks, Defendants' first argument is effectively moot.

 Defendants also argue that Plaintiff has "failed to plead facts with particularity supporting a strong inference that [the 10b–5 Defendants] engaged in any culpable conduct, further precluding liability under Section 20(a)." Defs.' Mot. 18:3–5. Simply stated, under Ninth Circuit precedent, "Plaintiff need not show that the defendant was a culpable participant in the violation, but defendant may assert a 'good faith' defense." *Howard*, 228 F.3d at 1065 (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990)). As Plaintiff need not show culpability on the part of 10b–5 Defendants, Defendants' culpability and corresponding particularity arguments are properly asserted in its answer, not a 12(b)(6) motion.

Defendants' final argument is, however, still relevant. Plaintiff has made numerous claims regarding the actions of each individual defendant. Moreover, Plaintiff has adequately alleged that the 10b–5 Defendants are also "primary violators." However, in Plaintiff's FAC, Plaintiff does not *explicitly* state who was controlled by whom, how they were controlled, or when the control existed. Nevertheless, in Plaintiff's Reply, Plaintiff directs the Court to three paragraphs of Plaintiff's FAC (¶¶ 112, 116, 120) that Plaintiff purports adequately plead control liability. These three paragraphs all indicate that on various specified dates, 10b–5 Defendants "caused" Quest to file several misstated financial results.[4] Thus, Plaintiff alleges that Quest is a primary violator by virtue of the false financial statements filed during the Class Period; and that Defendants Smith, Morse, Doyle, Murdock, and Brooks are all properly included as control persons for their collective exercise of control over the primary violator Quest. *See Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir.2000). Plaintiff has sufficiently pled: (1) a primary violator (Quest); (2) that Defendants' respective positions gave them control over the primary violator; and (3) via the financial statements, that Defendants exercised said control. Thus, the Court finds that Plain-

---

4. These three paragraphs (¶¶ 112, 116, 120) standing in isolation are insufficient under Fed. R. Civ. Proc. 9(b). However, Plaintiff's FAC precisely specifies which financial statements are misstated, who signed the statements, and why the statements were false. *See* Pl.'s Reply at 23:19–21 n. 33. The this additional particularity is sufficient at this stage of the proceedings.

tiff has properly alleged control person liability with regard to Defendants Smith, Morse, Doyle, Murdock, and Brooks.

As previously stated in §§ III(F) and (G), *supra,* the factual scenario surrounding Lambert makes the appropriateness of his inclusion less clear. Plaintiff argues that the Individual Defendants' wrongdoing extends beyond the final backdated option grant date (August 7, 2002) because the Individual Defendants failed to disclose the compensation expense in financial statements filed after the backdating practices ceased. For Plaintiff to maintain its theory, it must be assumed that Individual Defendants were aware of the option backdating scheme, yet despite this knowledge, after the backdating practice terminated, the Individual Defendants continued to fail to report the corresponding compensation expense. However, for the same reasons discussed in § III(F), *supra,* this theory cannot be applied to Lambert.

 Lambert joined Quest in January 2004, nearly a year and a half after the last backdated option was granted. Even assuming that the Individual Defendants waited until the end of the 2002 fiscal year to report the last set of backdated options, this report would likely have been made no later than March 31, 2003, the date on which Quest filed its 2002 10–K. Thus the last backdated options would have been reported eight full months before Lambert became Quest's Senior Vice President of Finance. This extended period of time makes it unlikely that Lambert knew of the backdating practices that had taken place a year and a half before his arrival at Quest. Nevertheless, to " 'establish the liability of a controlling person, the plaintiff does not have the burden of establishing that person's scienter distinct from the controlled corporation's scienter.' " *Howard,* 228 F.3d at 1065 (quoting *Arthur Children's Trust,* 994 F.2d at 1398 (9th Cir.1993)). Thus, since Plaintiffs have suf-

ficiently alleged Quest's liability, Lambert may still be properly included as a defendant in Plaintiff's § 20(a) claim at this early stage because of his control over Quest.

 Nevertheless, a problem exists for Garn and Quest's control person liability. According to Plaintiff's FAC, Garn was a Vice President from January 1998 through January 2002, left the company for one year, returning as Vice President from January 2003 through February 2005. Garn has been the President of Quest since February 2005. Plaintiff did not allege, and it is difficult for the Court to determine how, as a Vice President, Garn was able to exercise control over the other 10b–5 Defendants when the other 10b–5 Defendants held positions of Vice President or higher; i.e., how can Garn exercise control over either his peer Vice Presidents or his supervisors. Moreover, Plaintiff has not alleged how Garn exercised control over Quest. In the three paragraphs of Plaintiff's FAC, Plaintiff has not alleged that Garn caused Quest to file any misstated financial statements. Thus, for Plaintiff to establish Garn's control person liability, Plaintiff must provide factual support that Garn was in a position to control a primary violator. Accordingly, Plaintiff's § 20(a) claim against Garn is DISMISSED WITHOUT PREJUDICE.

Plaintiff has also alleged control person liability against Quest. As currently pled, Plaintiff's FAC does not allege how Quest exercised control over any of the other primary violators. Indeed, it would be difficult to fathom how Quest could control any of the Individual Defendants. Accordingly, Plaintiff's § 20(a) claim against Quest is DISMISSED WITHOUT PREJUDICE.

### J. Plaintiff's § 20A Claim

Count III of Plaintiff's FAC alleges that Defendants Smith, Doyle, Murdock,

Brooks, and Garn are liable for insider trading in violation of Section 20A of the Exchange Act, codified in 15 U.S.C. § 78t–1. Defendants have made three arguments related to this claim. The Court addresses these in turn.

Defendants' first argument is that Plaintiff has not alleged an independent violation of the securities laws, as required to plead a violation of Section 20A. This argument presupposes the granting of Defendants' Motion in its entirety. As the Court has already found that Plaintiffs have adequately pled a violation of § 10(b) and Rule 10b–5, this argument is effectively moot.

Defendants' second argument is that Plaintiff has not alleged a claim for insider trading with particularity. Specifically, Defendants argue Plaintiff's pleadings are insufficient because they fail to describe what the non-public information was, how each Individual Defendant learned of the information, or whether the Individual Defendants traded on the basis of that information. Defs.' Mot. 19:16–18. To the contrary, Plaintiff has sufficiently alleged the precise non-public information; i.e., the details of the undisclosed backdating practices. Plaintiff has also sufficiently alleged how each Individual Defendant learned of the information; i.e., they were either the beneficiaries of the options or had oversight over the option granting process. Finally, Defendants' argument that Plaintiff needs to show that Individual Defendants traded on the basis of this information is inapplicable to option backdating schemes. Again, option backdating schemes are unlike the prototypical insider trading scenario wherein an insider is aware of information that has a preordained disclosure date, the insider is aware that the information will have an effect on the stock price on the disclosure date (i.e., will cause the stock to rise or fall), and the insider therefore trades before the disclo-

sure date. Instead, in option backdating schemes, the information is never scheduled to be disclosed. As the information is never scheduled to be disclosed, the insider has no predetermined disclosure date before which the insider needs to execute his trades. Accordingly, it is improper to require Plaintiff to plead this requirement.

Defendants' final argument is that Plaintiff lacks standing because, with the exception of Smith, Plaintiff did not trade "contemporaneously" with Defendants. The "contemporaneous" term required by 15 U.S.C. § 78t–1 is inherently vague. Moreover, Congress did not intend to precisely define "'contemporaneous as used in § 20A', but instead apparently intended to adopt the definition 'which has developed through the case law.' " *Neubronner v. Milken,* 6 F.3d 666, 669 n. 5 (citing H.R.Rep. No. 910, 100 Cong., 2d Sess. 27 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6043, 6064). Unfortunately, thus far, the Ninth Circuit has not provided additional significant guidance. In *Neubronner,* the Ninth Circuit specifically refrained from determining the "exact contours of 'contemporaneous trading'..." *Neubronner,* 6 F.3d at 670. The Court in *Neubronner* did, however, explain that "the contemporaneous trading rule ensures that only private parties who have traded with someone who had an unfair advantage will be able to maintain insider trading claims." *Id.* The *Neubronner* Court also endorsed a Second Circuit holding that "noncontemporaneous traders to not require the protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of trading with someone who has superior access to information." *Id.* at 669 (citing *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 94–95 (2d Cir.1981)).

Defendants have also directed the court to several district court cases that Defendants claim stand for the proposition that

" 'contemporaneous trading' requires plaintiffs asserting a Section 20A claim to have traded on the same day as defendants." Defs.' Mot. 20:14–15. The cases Defendants cite state that the underlying purpose behind Section 20A: to serve "as a proxy for the traditional requirement of contractual privity between plaintiffs and defendants." *In re AST Research Sec. Litig.*, 887 F.Supp. 231, 233 (C.D.Cal.1995). Accordingly, the "contemporaneous" time frame between an insider's sale and a plaintiff's purchase is relatively short because it is possible that the plaintiff purchased the actual shares sold by the insider. As the time between the insider's sale and plaintiff's purchase increases, the likelihood that the shares purchased by the plaintiff are the same shares the insider sold decreases substantially.

 This is not, however, the only interpretation of the purpose behind Section 20A. An examination of relevant cases in the Second Circuit reveals a different interpretation.[5] In *In re Am. Bus. Computers Corp. Sec. Litig.*, the Court held that "the better rule with respect to standing seems to be that a class action may be maintained on behalf of all persons who purchased stock on an exchange during the period that defendants were selling that stock on the basis of insider information." *In re Am. Bus. Computers Corp. Sec. Litig.*, 1994 WL 848690, *4 (S.D.N.Y. February 24, 1994). Given that the Ninth Circuit has explicitly declined to define the contours of the "contemporaneous" requirement, after examining various approaches, the Court follows the more persuasive rule, that of Judge Brieant in *Am. Bus. Computers Corp.*

In this case, as a direct result of Individual Defendants' actions, Quest's stock was befouled from the very day of Quest's IPO.

There was a cloud over Quest's stock from before the Company's IPO in 1999 through the release of the Goldman Sachs' May 19, 2006 report. Thus, applying the *Am. Bus. Computers Corp.* rule, any trading done by Plaintiff before the Goldman Sachs' report was contemporaneous with the Individual Defendants' stock sales. While Plaintiff has not alleged in its FAC, or an exhibit thereto, precisely when it purchased shares of Quest's stock, in another filing with the Court, Plaintiff specified the precise days when it purchased and sold Quest stock. *See* Dec. of Patricia I. Avery in Support of Mot. of Middlesex Retirement Sys. to be Appointed Lead Pl. and for Approval of Lead Pl.'s Selection of Counsel, Ex. A at 3. The dates provided show that Plaintiff traded on the same day as Smith, within eight days of Garn, and within three days of Brooks. Plaintiff is granted leave to amend to add allegations related to its purchase of Quest stock. Once Plaintiff does so, Defendants' Motion to dismiss Count III, insider trading will be deemed DENIED.

## IV. DISPOSITION

For the reasons set forth above, Defendants' Motion is hereby GRANTED IN PART and DENIED IN PART.

Defendants' Motion to Dismiss Plaintiff's first claim, securities fraud in violation of § 10(b) and SEC Rule 10b–5, is DENIED with respect to Defendants Quest, Smith, Morse, Doyle, Murdock, and Brooks. However, Defendants' Motion to Dismiss Plaintiff's first claim, securities fraud in violation of § 10(b) and SEC Rule 10b–5, is GRANTED and the claim is DISMISSED WITHOUT PREJUDICE with respect to Defendant Lambert.

---

5. The Second Circuit is examined because the case that the Ninth Circuit heavily relied upon for its *Neubronner* decision, *Wilson v. Com-* *tech,* was a decision from the Second Circuit. Accordingly, district courts interpreting the Second Circuit's *Wilson* decision are helpful.

Defendants' Motion to dismiss Plaintiff's second claim, "control person liability" under § 20(a) of the Exchange Act, is DENIED with respect to Defendants Smith, Morse, Doyle, Murdock, and Brooks; but the Motion is GRANTED and the claim is DISMISSED WITHOUT PREJUDICE with respect to Defendants Quest and Garn.

Finally, as to Defendants's Motion to Dismiss Plaintiff's third claim, insider trading under Section 20A of the Exchange Act, is HELD IN ABEYANCE pending Plaintiff's filing of an amended complaint. However, as stated above, once Plaintiff adds allegations pertaining to its purchase of Quest's stock, Defendants Motion to dismiss Plaintiff's third claim will be deemed denied.

Plaintiff shall have until December 1, 2007 to file an amended complaint. This additional time is being allotted to allow Plaintiff sufficient time to examine Quest's revised financial reports that were due to NASDAQ by September 17, 2007.[6]

The Clerk shall serve this minute order on all parties to the action.

---

**6.** Additionally, when Plaintiff files its amended complaint, Plaintiff is directed to use either a legible fax or another method of transmission, as the copy provided to the Court was virtually unreadable.